UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| THOMAS FRIEND )<br>  *Plaintiff*, )<br> )<br>v.                        )<br> )<br>ANDREW SAUL, Commissioner of the )<br>Social Security Administration,[1] )<br>  *Defendant*. | 3:19-CV-00211 (KAD)<br><br><br><br><br><br>May 13, 2020 |

**MEMORANDUM OF DECISION RE: PLAINTIFF'S MOTION TO REVERSE [ECF NO. 12] AND DEFENDANT'S MOTION TO AFFIRM [ECF NO. 16]**

Kari A. Dooley, United States District Judge:

Thomas Friend (the "Plaintiff"), through his counsel, brings this administrative appeal pursuant to 42 U.S.C. § 405(g). On June 15, 2019, the Plaintiff filed a motion to reverse the decision of Defendant Andrew M. Saul, Commissioner of the Social Security Administration (the "Commissioner"), denying Plaintiff's application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act") and his application for supplemental security income ("SSI") pursuant to Title XVI of the Act, or in the alternative and/or remand this matter for further proceedings. (ECF No. 12). The Commissioner moves for an order affirming its decision. (ECF No. 16). For the reasons set forth below, the Court grants the Plaintiff's alternative request that this matter be remanded. Accordingly, the Commissioner's motion to affirm is denied.

**Standard of Review**

A person is "disabled" under the Act if that person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

---

[1] The Plaintiff commenced this action against Nancy A. Berryhill as the Acting Commissioner of Social Security on February 12, 2019. Andrew M. Saul subsequently became the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner Saul is automatically substituted for Nancy A. Berryhill as the named defendant. The Clerk of Court is directed to amend the caption in this case accordingly.

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id*. § 423(d)(3). In addition, a claimant must establish that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id*. § 423(d)(2)(A).

      Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether a claimant's condition meets the Act's definition of disability. *See* 20 C.F.R. § 404.1520. In brief, the five steps are as follows: (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment" or combination thereof that "must have lasted or must be expected to last for a continuous period of at least 12 months"; (3) if such a severe impairment is identified, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment "meets or equals" an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the "meets or equals" requirement, the Commissioner must then determine the claimant's residual functional capacity ("RFC") to perform his past relevant work; and (5) if the claimant is unable to perform his past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform in light of his RFC and his education, age, and work experience. *Id*. §§ 404.1520 (a)(4)(i)-(v); 404.1509. The claimant bears the burden of proof with respect to Step One through Step Four, while the

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id*. § 423(d)(3). In addition, a claimant must establish that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id*. § 423(d)(2)(A).

Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether a claimant's condition meets the Act's definition of disability. *See* 20 C.F.R. § 404.1520. In brief, the five steps are as follows: (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment" or combination thereof that "must have lasted or must be expected to last for a continuous period of at least 12 months"; (3) if such a severe impairment is identified, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment "meets or equals" an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the "meets or equals" requirement, the Commissioner must then determine the claimant's residual functional capacity ("RFC") to perform his past relevant work; and (5) if the claimant is unable to perform his past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform in light of his RFC and his education, age, and work experience. *Id*. §§ 404.1520 (a)(4)(i)-(v); 404.1509. The claimant bears the burden of proof with respect to Step One through Step Four, while the

Commissioner bears the burden of proof as to Step Five. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

The fourth sentence of Section 405(g) of the Act provides that a "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). It is well-settled that a district court will reverse the decision of the Commissioner "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015) (*per curiam*); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations marks and citation omitted). "In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (internal quotation marks and citation omitted). "Under this standard of review, absent an error of law, a court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have ruled differently." *Campbell v. Astrue*, 596 F. Supp. 2d 446, 448 (D. Conn. 2009). The Court must therefore "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), and can only reject the Commissioner's findings of fact "if a reasonable factfinder would *have to conclude otherwise*," *Brault v. Social Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (*per curiam*) (internal quotation marks and citation omitted).

Stated simply, "[i]f there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian*, 708 F.3d at 417.

**Background and Procedural History**

On July 8, 2016 and July 15, 2016, Plaintiff filed applications for DIB and SSI, respectively, pursuant to Title II and Title XVI of the Act, alleging an onset date of December 1, 2013. The claims were initially denied on October 21, 2016, and upon reconsideration on April 20, 2017. Thereafter, a hearing was held before an ALJ on March 6, 2018. On April 27, 2018, the ALJ issued a written decision denying Plaintiff's applications.

In her decision, the ALJ followed the sequential evaluation process for assessing disability claims. At Step One, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 1, 2013. At Step Two, the ALJ determined that Plaintiff had medically determinable severe impairments consisting of major depressive disorder and anxiety disorder. The ALJ also determined that the Plaintiff had non-severe impairments to include headache disorder and seizure disorder. At Step 3, the ALJ determined that neither of the severe impairments meets or medically equals the listings in 20 CFR Part 404, Subpart P, Appendix 1. At Step Four, the ALJ determined that the Plaintiff had a residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: "The claimant has a limitation in concentration, persistence and pace with the ability to understand, remember, and carry out simple and detailed, but not complex, tasks and is limited to object-oriented tasks, with only occasional superficial work-related interactions with co-workers, supervisors, and the general public." (Tr. 14). The ALJ further found that Plaintiff was unable to perform his past relevant work as a desktop support-user/support analyst and construction worker II. Finally, at Step Five, the ALJ concluded that there are a significant number of jobs in the

national economy that Plaintiff could perform given the limitations identified in the RFC. Accordingly, the ALJ found Plaintiff was not disabled at any time between the alleged onset date through the date of the decision within the meaning of the Act.

On December 18, 2018, the Appeals Council denied Plaintiff's request for review, thereby rendering final the ALJ's decision. This appeal followed.

**Discussion**

Upon review of the entire record in this matter, the Court is left with the profound belief that Plaintiff labors under a debilitating mental illness that the ALJ either failed to appreciate or simply ignored. Plaintiff is 50 years old. He is educated and has a long work history. Until 2016, he lived independently even though he had stopped working in 2013. Since 2016, his life has revolved around mental health treatment—individual and group therapy, medication management with his treating psychiatrist and attending day programs designed to teach and encourage independent living or life skills for the mentally disabled. Accordingly, for the reasons to follow, the Court remands this matter to the Commissioner for further consideration and subject to the directives herein.

**The Residual Functional Capacity is not Supported by Substantial Evidence**

In reaching a decision, an ALJ must consider "all evidence" in the record. *See Cruz v. Colvin*, No. 3:14-CV-01331 (SALM), 2015 WL 5768384, at *8 (D. Conn. Oct. 1, 2015) (citing 20 C.F.R. § 416.920(a)(3)) ("An ALJ has a legal duty to consider 'all evidence' in the case record before making a determination as to whether a claimant is eligible for disability benefits."). While the ALJ "does not have to state on the record every reason justifying a decision," *Brault*, 683 F.3d at 448, the "crucial factors" relied upon by the ALJ "must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence."

*Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). And remand to the Commissioner may be appropriate where the Court is "'unable to fathom the ALJ's rationale in relation to the evidence in the record' without 'further findings or clearer explanation for the decision.'" *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).

In addition, it is well-settled that an ALJ is not permitted to "cherry pick" portions of the record to support the ALJ's findings. *See Sena v. Berryhill*, No. 3:17-CV-912 (MPS), 2018 WL 3854771, at *9 (D. Conn. Aug. 14, 2018) ("It is well-settled that an ALJ may not cherry-pick evidence by improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source.") (internal quotation marks and citations omitted); *see also Lopez v. Sec'y of Dep't of Health & Human Servs.*, 728 F.2d 148, 150–51 (2d Cir. 1984) ("We have remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him."); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (same); *Wright v. Berryhill*, No. 3:17-CV-00501 (JAM), 2018 WL 3993442, at *5 (D. Conn. Aug. 21, 2018) ("While it is well established that the ALJ need not address every shred of evidence in the administrative record, the ALJ may not simply ignore probative evidence from plaintiff's treating physician."). For example, in *Rodriguez v. Colvin*, the court agreed with plaintiff that "the ALJ 'cherry picked' the medical source opinions that supported his [RFC] determination and ignored those that detracted from it and thus, his decision [was] not supported by substantial evidence." No. 3:13-CV-1195 (DFM), 2016 WL 3023972, at *1–2 (D. Conn. May 25, 2016) (explaining "cherry picking" as "suggest[ing] a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both. . . .") (internal quotation marks and citation omitted). There, the court found that the ALJ erred insofar as he dismissed the treating physician's assessment regarding the plaintiff's inability to work due to his "anxiety, panic attacks,

and irritability," among other reasons, even though "[t]he record [was] replete with evidence that support[ed] the [treating physician's] assessment." *Id*. at *2. The court noted that the "ALJ's decision [was] silent as to this evidence." *Id*. Accordingly, the court remanded the case back to the ALJ because "[i]t is grounds for remand [when the ALJ] ignore[s] parts of the record that are probative of the claimant's disability claim." *Id*. (internal quotation marks and citations omitted).

Here, although acknowledging some, though by no means all, testimony, records and opinions that would undermine a finding that the Plaintiff is not disabled, the ALJ either does not explain her decision to dismiss such evidence or summarily does so based on a generic finding that the evidence is inconsistent with the record on whole. But a review of the entire record, as discussed below, reveals otherwise. Indeed, the ALJ's decision appears to have ignored substantial portions of the record evidence.

In February 2016, the Plaintiff was discovered by his sister in his apartment. He was confused, disoriented and unkempt. There was little food in the home and the electricity and cable had been cut off. It did not appear that the Plaintiff had left his home for many days. He was taken to the emergency room. Upon discharge, he moved in with his parents. The Plaintiff's mother testified that her husband flew back from Florida when the Plaintiff had this psychotic episode and found the Plaintiff disoriented, confused and disconnected from the world. (Tr. 51).[2]

With respect to these events, the ALJ relied upon the emergency room doctor's cynical assessment that "spending too much time in the apartment [or] hav[ing] an empty [refrigerator did] not . . . raise [a] concern for psychosis . . . ." (Tr. 684). The ALJ ignored that the Plaintiff was

---

[2] This was not the Plaintiff's first episode of this nature. In 1997, the Plaintiff was admitted to Yale-New Haven Hospital on referral from Stamford Hospital. On admission he was "not verbal" and was admitted "because of increased agitation, decreased sleep, decreased food intake, and abnormal perceptions (visual and auditory hallucinations)." (Tr. 30). Upon being given Haloperidol, "the psychosis rapidly cleared. The patient became verbal and was able to relate that the reason he was withdrawn and unresponsive was that he was hearing voices telling him not to respond to the examiner." (Tr. 33). The diagnosis at discharge was "[p]sychotic disorder, not otherwise specified." (Tr. 29). This record was submitted to the Appeals Council and so was not available to the ALJ. (Tr. 27).

7

referred for a psychiatric evaluation; the evaluation was undertaken in the days and weeks following his treatment at the ER; and the resulting diagnosis was, in fact, psychosis—unspecified. Without even acknowledging this diagnosis, the ALJ then selected various treatment notes during the following months in 2016 which reflected that the Plaintiff showed improvement when medicated with Latuna; the Plaintiff was engaged in group therapy and was "less withdrawn;" his family reported "improvement in mood, affect and general demeanor;" and that in December of 2016, the Plaintiff reported "structured activities help him to feel better." (Tr. 425, 528). But reliance on these (and similar) isolated entries ignores large portions of the record which belie the import that the ALJ ascribed to them.

While it is accurate that Dr. Graham's treatment records generally reflect that the Plaintiff was consistently oriented to time, place and person; his cognitive functioning appeared normal; his behavior demonstrated no abnormalities; the Plaintiff had "[n]ormal enjoyment of activities," "[n]o decreased functioning ability" and "[n]o inability to cope with daily activities," (*see e.g.* Tr. 447), these notes are inconsistent with the majority of the other medical records and are inconsistent with Dr. Graham's medical source statement.

The record reveals that within days of his ER treatment, the Plaintiff was evaluated. He exhibited delusional thinking and sometimes "[b]izarre" affect. (Tr. 455). He was diagnosed with an unspecified psychosis and early onset dementia rule out. (Tr. 460). He has been on medication and receiving treatment regularly and frequently since March of 2016. In fact, the Plaintiff does very little other than seek and receive treatment for his mental health issues. He goes to individual therapy and group therapy every week at Optimus Health. He sees his psychiatrist once a month for medication management and treatment. Five days a week, he goes to "Pathways" a center for mentally ill adults, which offers programming, life skills training and other services. The records

from Pathways reveal that as of December 20, 2017, although the Plaintiff wanted to move into the residential facility at Pathways he lacked the "independent living skills" to do so. (Tr. 585).

Further, Dr. Graham submitted a medical source statement dated February 10, 2017 which concluded that the Plaintiff had a "long history of disorganization and difficulty caring for self" and had only shown "small improvement in his functioning" during treatment. (Tr. 466). Dr. Graham opined that the Plaintiff had "trouble with attention and concentration," had "fair" insight and that "his illness impairs his coping skills and frustration tolerance." (Tr. 467–68).

The ALJ afforded this opinion "little weight" and summarily concluded that it was inconsistent with Dr. Graham's own treatment records and the record as a whole. (Tr. 19). The Optimus treatment records however, are entirely consistent with this opinion. The record is replete with examples of the extent to which the Plaintiff is cognitively impaired.

By way of example only, on November 15, 2016, the Plaintiff showed Ms. Treacy, his therapist, the denial letter he received regarding his application for "SSD, stating that pt said he had an 'undiagnosed psychosis', pt was reminded that he has a diagnosis, and explained it is 'unspecified psychosis', **as we discussed in his last session and in previous sessions**. [P]t admits he has difficulty remembering his diagnosis, and admits having memory problems in general." (Tr. 539) (emphasis added). Just two weeks later, the treatment notes reflect that the Plaintiff did not recall or understand that he had been denied Social Security benefits. The notes reveal:

> [P]t states, I need a letter with my diagnosis for Social Security. [P]t was asked if he has filed an appeal, yet. [P]t states, "No, the letter was just a form, the letter is a form[], they just send that to everyone. No decision is made." Writer offered to assist pt with call to the social security office, in order for pt to understand the letter was a denial of SSD benefits. Pt verbally accepted the offer/ writer assisted pt with the call to the social security office. Both pt/writer were informed that pt's last letter from SSD was a denia[l] of SSD benefits. [P]t was informed by SSD the decision was determined a while ago/ pt needs to appeal ASAP. [P]t states, "so that means, everything's okay. I don't have to rush." Per pt's verbal request/consent, writer explained to pt's parents with pt being present, after the session ended that pt was

9

>informed by social security office he nee[d]s to appeal as soon as possible, if he wishes to appeal the decision.

(Tr. 534). The Optimus treatment records also reflect that the Plaintiff does not handle a change to his routine well and gets frustrated as a result. (Tr. 530).

The ALJ also improperly relied on Plaintiff's testimony when to do so supported the ALJ's decision but discounted it when it did not. *See Sena*, No. 3:17-CV-912 (MPS), 2018 WL 3854771, at *9 ("It is well-settled that an ALJ may not cherry-pick evidence by improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source.") (internal quotation marks and citations omitted); *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his [or her] determination . . . ."). For example, the ALJ relied upon the Plaintiff's testimony that he thought he could work an eight-hour day, five days a week. (Tr. 16). But the record also included a Modified Global Assessment Functioning Scale ("MGAF") score of 38, which reflected that the Plaintiff has a "[s]erious impairment with work, school or housework;" a "[s]erious impairment in relationships with friends . . . [and] family" and a "[s]erious impairment in judgement." (Tr. 576). The ALJ discounted the MGAF assessment because it was the product of the Plaintiff's self-report and because it was inconsistent with the Plaintiff's hearing testimony. (Tr. 17). This contradictory reasoning exemplifies the ALJ's improper cherry picking.

And while ordinarily, reliance on the Plaintiff's testimony would be appropriate, *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . [and the ALJ] may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.") (internal citations omitted), on this record, it is clear that the Plaintiff's

testimony regarding his own capability is unreliable and is, itself, symptomatic of his mental illness. The record reveals that the Plaintiff has very little, if any, insight into his own mental illness. His insight is described as "nil," (Tr. 455), "lack[ing]" (Tr. 578, 581) and in fact "compound[s]" the issues which impair his functioning. (Tr. 575). On September 26, 2016, although participating in a group session at which living with mental illness was discussed, the Plaintiff nonetheless "did not acknowledge symptoms of mental illness." (Tr. 557). As of December 2017, the Plaintiff still "lacks insight into many of the areas in which he has deficits." (Tr. 585). And when asked about his mental health, he only states that he "'has headaches' but denies mental health issues." (Tr. 585). Indeed, his own testimony stands in stark contrast to the very fact that he has applied for disability benefits and testified that he cannot work because of "anxiety and nerves." (Tr. 40). The testimony also stands in stark contrast to the evidence that he has been actively seeking employment, with the assistance of a vocational coach at "Laurel House," and still has been unable to secure employment.

Moreover, at the hearing, Plaintiff's counsel specifically advised the ALJ that she offered the mother's testimony because the Plaintiff is incapable of understanding and acknowledging his own deficits. (Tr. 39).[3]

With respect to the discounted MGAF assessment, the assessment is consistent with the Plaintiff's mother's testimony in terms of what the Plaintiff can and cannot do on a sustained basis.

---

[3] In this vein, it is notable that when asked why he took the medication Vraylar the Plaintiff responded, "[t]hat's for rest. They want me to get more rest." (Tr. 43). But Vraylar, the brand name of Cariprazine, "is used to treat certain mental/mood disorders (such as bipolar disorder, bipolar depression, schizophrenia). Cariprazine belongs to a class of drugs known as atypical antipsychotics. It works by helping to restore the balance of certain natural substances in the brain. This medication can decrease hallucinations, help [patients] to think more clearly and positively about [themselves], feel less agitated, and take a more active part in everyday life." *Vraylar*, WEBMD, https://www.webmd.com/drugs/2/drug-170027/vraylar-oral/details (last visited May 13, 2020).

Her testimony painted a difficult picture of a borderline functional adult who requires constant supervision, prompting and oversight to get through tasks. (Tr. 48–55). Notwithstanding the consistency between the MGAF assessment and the mother's testimony, the ALJ also gave "little weight" to the testimony concluding without explanation that it was "not consistent with the overall record." (Tr. 17). The discounted MGAF assessment is also consistent with Dr. Graham's source statement as discussed above, and the treatment records available to the ALJ. In addition to those records discussed above which corroborate the MGAF assessment, treatment notes from November 3, 2017 reflect that the Plaintiff was "proud of himself for co-leading a walk in the park with other group members at Pathways. Pt states 'it went over big.'" (Tr. 596). Treatment notes from November 22, 2017 reflect that the Plaintiff struggles to make conversation with others in group so "pt will try to ask his nephew questions in order to initiate a conversation." (Tr. 591). In this same vein, treatment notes from December 1, 2017 reflect that "[p]t admits having difficulty with talking in full sentences or making conversation with others." (Tr. 588–89). Further, a May 25, 2017 assessment reflects that the Plaintiff has "Psychosis F29 Unspecified Psychosis a/e/b impaired cognitive functioning, delusional thinking, social isolation, memory impairment, and decreased executive functioning." (Tr. 640). The same assessment reflects that the "psychiatric symptoms appear well controlled with psychiatric medication/therapy" but that continued treatment was justified "[i]n order to stabilize mood and improve functionality . . . ." *Id*. On July 28, 2017, the notes reflect: "Pt appears to have very poor insight about preparing for his future, as his parents grow older and he grows older. [P]t appears to have poor insight into his own cognitive limitations. [P]t shared that he still plans to get a job, and continuously says 'I don't know why I don't hear back from companies, for jobs I applied at.'" (Tr. 621). At that same session, the Plaintiff reported that "his mother continues to drive him back and fort[h] [to] the fellowship

program at Pathways during the week, and pt explains 'I wouldn't know how to get there by myself.'" (Tr. 621).[4] In short, the treatment records for the Plaintiff paint an unmistakable picture of an adult who struggles in multiple areas of functionality, while simultaneously having little insight into the myriad of his own problems and deficits.

Lastly, the ALJ afforded great weight to the consulting doctors, which is ordinarily within the ALJ's authority. *See Tyson v. Astrue*, No. 3:09-CV-1736 CSH, 2010 WL 4365577, at *10 (D. Conn. June 15, 2010), *report and recommendation adopted*, No. 3:09-CV-1736 CSH, 2010 WL 4340672 (D. Conn. Oct. 22, 2010) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993)) ("As the Second Circuit has held, the opinions of non-examining sources can override the treating sources' opinions provided they are supported by evidence in the record."). Here, however, Dr. Kravitz had no treatment records from after October 14, 2016 and Dr. Lev did not have the treatment records from after February 20, 2017. In addition, neither doctor had the benefit of the MGAF assessment or the records from Pathways.[5] Although the ALJ summarily concludes that "[e]vidence submitted after the date of their opinions does not warrant **a change to their findings** or to the weight given their opinions," (Tr. 19) (emphasis added), it is not for the ALJ to determine in the first instance whether additional records would impact a medical determination. The ALJ is not a doctor and she cannot espouse a medical opinion unsupported by any evidence. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[I]t is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions,

---

[4] The Court finds it remarkable that the ALJ relies upon his attendance at Pathways as a "good indicator of [the Plaintiff's] expected attendance in the work place," (Tr. 17), given that the Plaintiff told his therapist that he could not find his way there without his mother's help.

[5] Neither doctor had the 1997 records from Yale-New Haven Hospital which were submitted by the Plaintiff to the Appeals Council and which showed a history consistent with the Plaintiff's current diagnosis and treatment. (Tr. 27–35).

he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him.") (internal quotation marks and citation omitted). Such a conclusion is particularly troubling where, as here, the unseen records reflect significant deficits and a rather ominous prognosis for improvement. Accordingly, on remand, the ALJ is directed to submit the records received after the opinions were rendered and to seek an updated opinion from Dr. Kravitz and Dr. Lev or another appropriate consulting doctor if they are not available.

**Conclusion**

"The Court carefully considers the whole record, examining evidence from both sides 'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (internal quotation marks omitted) (quoting *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir.1997)). Taking all together the facts in this record, the Court cannot conclude that the ALJ's RFC determination is supported by substantial evidence. Rather, it is clear that the ALJ overlooked or ignored significant objective medical evidence, and misread, misinterpreted or misstated portions of the record. *See Tejada*, 167 F.3d at 776. Under any reading of the record in this matter, Mr. Friend has significant and serious mental health conditions which the ALJ, inexplicably, did not adequately recognize in formulating the RFC.[6] *See Pratts*, 94 F.3d at 39 (quoting *Berry*, 675 F.2d at 469 (Remand is warranted where the Court is "'unable to fathom the ALJ's rationale in relation to the evidence in the record' without 'further findings or clearer explanation for the decision.'")). The extent to which the Plaintiff's

---

[6] Perhaps most telling on this point is the ALJ's closing observation that "[t]he [Plaintiff] has generally received conservative and routine mental health treatment." (Tr. 19). The record before the Court completely refutes this statement. To the contrary, since March 2016, the Plaintiff has been receiving psychiatric treatment; individual therapy; group therapy, pharmacological intervention, vocational coaching, and he goes to a day program for adults with mental illness 5 days a week for three and a half hours per day. This strikes the Court as neither routine nor conservative.

impairments impact the Plaintiff's ability to work requires a closer examination of the record than was afforded him by the ALJ.

Accordingly, the Commissioner's Motion to Affirm is DENIED. The Plaintiff's Motion to Reverse or in the Alternative to Remand is GRANTED. The Clerk of the Court is directed to enter Judgment in favor of the Plaintiff and to remand this matter to the Commissioner for rehearing pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the Commissioner shall seek updated opinions from Dr. Kravitz and Dr. Lev, or another suitable consultant if either of them is not available. The ALJ shall reassess the weight to be given all medical opinions in this matter; shall reformulate the Plaintiff's RFC and determine anew whether the Plaintiff was disabled as of 2013 or at any time thereafter to the date last insured. The Court does not require, but strongly encourages the Commissioner to assign a different ALJ to hear this matter on remand.

The Clerk of the Court is further instructed that if a subsequent appeal to this Court is made following remand, it is to be assigned to the undersigned.

**SO ORDERED** at Bridgeport, Connecticut, this 13th day of May 2020.

  */s/ Kari A. Dooley*
  KARI A. DOOLEY
  UNITED STATES DISTRICT JUDGE